# IN THE COURT OF APPEALS OF IOWA

No. 13-1007
Filed March 25, 2015


**GORDON MOSHER, et al.,**
        Plaintiffs-Appellees,

**vs.**

**DEWAAY FINANCIAL NETWORK, LLC, et al.**
        Defendants-Appellees,

**P. RUSSELL HANSEN, DEBORAH HANSEN,
MARK VERMEER, and All Similarly Situated
Individuals,**
        Intervenors-Appellants.
_____

**WAYNE EDGERTON, et al.,**
        Plaintiffs-Appellees,

**vs.**

**DEWAAY FINANCIAL NETWORK, LLC, et al.**
        Defendants-Appellees,

**P. RUSSELL HANSEN, DEBORAH HANSEN,
MARK VERMEER, and All Similarly Situated
Individuals,**
        Intervenors-Appellants.
_____


        Appeal from the Iowa District Court for Decatur County, John D. Lloyd,

Judge.


        Intervenors appeal from orders certifying a non-opt-out, limited-fund class

and approving a settlement in these consolidated actions.  **AFFIRMED IN PART,**

**REVERSED IN PART, AND REMANDED.**

Andrew B. Howie, Frederick B. Anderson, and J. Barton Goplerud of Hudson, Mallaney, Shindler, & Anderson, P.C., West Des Moines, for plaintiffs-appellees.

Steven P. Wandro and Kara M. Simons of Wandro & Associates, P.C., Des Moines; Angela R. Hill, Leon; and Samuel Y. Edgerton III and Elizabeth M. Del Cid of Edgerton & Weaver, L.L.P., Hermosa Beach, California; for defendants-appellees.

Gail E. Boliver of Boliver Law Firm, Marshalltown, and David Neuman of Stoltmann Law Offices, P.C., Chicago, Illinois, for intervenors-appellants.

Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, C.J.**

We must decide if a non-opt-out, limited-fund class action was appropriately certified and settled.[1] The intervenors in these actions contend the district court abused its discretion in certifying a class and the settlement is unfair and unreasonable. They also maintain the district court unreasonably restricted their discovery, abused its discretion in consolidating the actions, and erred as a matter of law in denying their motion to transfer venue.

We conclude the district court abused its discretion in approving this non-opt-out, limited-fund class certification for purposes of settlement because there has been no determination of the "maximum" amount of funds available for settlement. We deny the relief requested by the intervenors in respect to discovery, consolidation, and venue. We reverse in part and remand for further proceedings.

---

[1] "The principal role of the court of appeals is to dispose justly of a high volume of cases." Iowa Ct. R. 21.11. Here, our task has been greatly complicated. The nine volumes of the appendix contain no "list of relevant docket entries." *See* Iowa R. App. P. 6.905(2)(b)(2). In this several-thousand-page appendix, one table of contents exists for eight of the nine volumes of appendices. *See* Iowa R. App. P. 6.905(2)(b)(1). (The supplemental appendix does include its own table of contents.) Transcript pages are dispersed among volume eight and the supplemental appendix and are not in chronological order. *See* Iowa R. App. P. 6.905(7)(b) ("Any portion of a transcript of proceedings shall appear in the chronological order of the proceedings."). While some appendices pages containing transcript do bear the name of the testifying witness, many pages of volume eight do not. *See* Iowa R. App. P. 6.905(7)(c) ("The name of each witness whose testimony is included in the appendix shall be inserted on the top of each appendix page where the witness's testimony appears."). Omissions of transcript pages are not indicated by three asterisks as required. *See* Iowa R. App. P. 6.905(7)(e) ("The omission of any transcript page(s) or portion of a transcript page shall be indicated by a set of three asterisks at the location on the appendix page where the matter has been omitted.").

**I. Background Facts and Proceedings.**

These proceedings involve the sale of private placement investments,[2] many offered by DBSI Inc.[3] and Provident Royalties LLC,[4] both of which were represented here by trustees appointed in bankruptcy courts. Donald G. DeWaay Jr. and related entities,[5] offered the 199 private placements at issue here to their clients as investments.

---

[2] "[A] private placement is an offering of a company's securities that is not registered with the Securities and Exchange Commission (SEC) and is not offered to the public at large." http://www.finra.org/newsroom/2013/finra-issues-new-investor-alert-private-placements%E2%80%94evaluate-risks-placing-them-your (last visited on March 23, 2015). The Financial Industry Regulatory Authority website cautions, "Investors should understand that many private placement securities are issued by companies that are not required to file financial reports, and investors may have problems finding out how the company is doing." *Id.*

[3] In November 2008, DBSI Inc. and several of its affiliates "filed for bankruptcy protection under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. [The d]ebtors' plan of liquidation was confirmed in October 2010, naming James R. Zazzali ('Trustee') as litigation trustee of the DBSI Estate Litigation Trust." *In re DBSI, Inc.*, 467 B.R. 767, 769 (Bankr. D. Del. 2012) (summarizing bankruptcy adversary actions). "DBSI and its related entities were involved in three main spheres of business activity: the syndication and sale to investors of tenant-in-common interests in real estate, the purchase of real estate, and investments in technology companies." *In re DBSI, Inc.*, 445 B.R. 344, 346 (Bankr. D. Del. 2011).

[4] *See In re Provident Royalties, LLC*, 517 B.R. 687, 689 (Bankr. N.D. Tex. 2014) (noting Milo H. Segner Jr. is the Liquidating Trustee of the PR Liquidating Trust, an entity formed in bankruptcy cases, whose task it was to collect and liquidate the assets of Provident Royalties, LLC and other jointly-administered debtors as part of each of the debtors' confirmed Chapter 11 plans). Provident's purported business was the development of oil and gas properties, and the Provident securities were sold as preferred stock and partnership interests in a series of shale gas ventures. *See Billitteri v. Sec. Am., Inc.*, No. 3:09-CV-01568-F, 2011 WL 3585983, at *1 (N.D. Tex. Aug. 4, 2011). One court has found Provident Royalties "operated as a Ponzi scheme." *Provident Royalties*, 517 B.R. at 695.

[5] For simplicity, we will identify all the defendants simply as DeWaay. Cyril Mandelbaum describes the DeWaay entities:

The various DeWaay operating entities include a complex web of single member limited liability companies, limited liability partnerships, and other partnerships. A significant component of the DeWaay entities' business is dedicated to private investment vehicles. The two main

***A. Lawsuits filed.*** On January 9, 2012, in Decatur County, Iowa, several plaintiffs filed two proposed class action lawsuits on behalf of themselves and other DeWaay investors, seeking a non-opt-out class certification under Iowa Rule of Civil Procedure 1.267(1)(b). One class action involved only DBSI private placement offerings by DeWaay. The other involved numerous other private placement offerings. The class action petitions[6] asserted hundreds, perhaps thousands, of putative class members invested over $40,000,000 with DeWaay in the different private placement offerings, including those of DBSI and Provident Royalties, and alleged, among other things, that DeWaay breached the duty of due diligence.

***B. Intervention allowed.*** P. Russell Hansen and Mark Vermeer were involved in arbitration proceedings before the Financial Industry Regulatory Authority (FINRA) asserting individual claims against DeWaay, which were stayed by the Iowa district court.[7]

---

operating organizations are DFN Partners, LLC and DeWaay Capital Management, Inc.

[6] On February 25, 2012, the putative class plaintiffs filed a motion to consolidate the two suits, which remained pending for more than one year.

[7] On March 5, 2012, the court granted the proposed class action plaintiffs a temporary restraining order, which provided in part:

5. Named Plaintiffs have obtained information that any potential awards in the pending arbitration proceedings, when combined with other potential claims by DeWaay's DBSI investors, would exhaust the limited funds available to resolve equitably the claims of all investors who purchased DBSI securities from DeWaay.

6. The Court finds that it has authority pursuant to the Iowa Rules of Civil Procedure to temporarily restrain all pending FINRA arbitrations from proceeding. The Court's exercise of this authority will protect the identified, limited funds from being depleted by the costs to defend the arbitrations until the Court determines whether to certify as a class all investors who purchased DBSI securities from DeWaay.

On May 3, 2012, Hansen and Vermeer were allowed to intervene in these proceedings on behalf of themselves and other arbitration intervenors. The intervenors sought extensive discovery, which the district court limited to "copies of attorney fee agreements, lists of the private placements and REITs [real estate investment trusts] and copies of any assignments to claims." The court also denied the intervenors' motion to change venue from Decatur County to Polk County.

*C. Proposed settlement.* On August 3, 2012, the putative class plaintiffs and defendants filed a notice of filing a settlement agreement. The proposed settlement agreement defines several terms, including the following: The defendants are defined as "DeWaay Financial Network LLC, DeWaay Capital Management, Inc., DFN Partners, LLC and Donald G. DeWaay, Jr. and their current and prior officers, directors, employees, agents, and Registered Representatives (defined below)."

The "Limited Fund" is defined as "the contribution from Donald G. DeWaay, Jr., in an amount that exceeds the amount that would be paid to unsecured creditors had the estate of Donald G. DeWaay, Jr., been liquidated under Chapter 7 of the United States Bankruptcy Code."

"'Policy Proceeds' means the amount of $2,000,000 from the Defendants' insurance carrier, the Scottsdale Insurance Company; and the amount of $75,000 from the Defendants' other insurance carrier, the Torus Specialty Insurance Company."[8]

---

[8] Under a section entitled "benefits of settlement to the settlement class," it states, "the Settlement Fund . . . totals $3,000,000."

"Settlement" is defined as "the resolution of the Class Actions and FINRA Arbitrations as described in this Settlement Agreement." And the "settlement class" is defined as "all investors, their representatives, successors, heirs, assigns, and any others authorized to act on their behalf, who purchased any of the Covered Products or received services in collection with these purchases from any of the Defendants, Defendants' officers, directors, employees or agents, or Registered Representatives." The definition excludes defendants and enumerated persons and entities whose claims DeWaay had already "resolved."

**D. Preliminary approval.** On August 29, 2012, the plaintiffs' attorneys moved for an order (1) preliminarily approving settlement in both actions, (2) certifying a non-opt-out class for purposes of settlement, (3) appointing class counsel, (4) setting a final fairness hearing, and (5) approving the issuance of notice to the class.

On November 19, 2012, the district court entered an amended order in which (1) the settlement agreement was preliminarily approved, (2) a non-opt-out class was certified for purposes of settlement, (3) class counsel were appointed, (4) notice was to issue to class members, and (5) timelines for objections and a date for a final fairness hearing were set.

**E. Motion for final approval of settlement and non-opt out class for purposes of settlement.** On December 17, 2012, the plaintiffs filed a motion for (1) an order approving final settlement, (2) certifying an Iowa Rule of Civil Procedure 1.267 (non-opt-out) class for purposes of settlement, (3) appointing class counsel, and (4) approving "the notice to the class as fulfilling due process." The defendants joined in the motion. Objections were filed by the intervenors

and some individuals who received notice pursuant to the court's November 19 order.

*F. Consolidation and final approval of non-opt-out, limited-fund class for purposes of settlement.* An evidentiary hearing was held on January 30, 31, and February 1, 2013. Following that hearing, the district court consolidated the two class actions; certified a non-opt-out, limited-fund class; and approved the proposed settlement. The intervenors now appeal.

## II. Scope and Standards of Review.

A district court's decision on class certification is reviewed for abuse of discretion. *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 44 (Iowa 2003). "Our class-action rules are remedial in nature and should be liberally construed to favor the maintenance of class actions." *Comes v. Microsoft Corp.*, 696 N.W.2d 318, 320 (Iowa 2005).

With respect to a class action, a district court's approval of a settlement agreement will not be set aside absent an abuse of discretion. *City of Dubuque v. Iowa Trust*, 587 N.W.2d 216, 220 (Iowa 1998) (citing predecessor to Iowa Rule of Civil Procedure 1.271, which provides a class action may not be "compromised" without court approval).

The district court abuses its discretion only where its grounds for deciding the class certification issue are clearly unreasonable. *See Varner v. Schwan's Sales Enters., Inc.*, 433 N.W.2d 304, 305 (Iowa 1988).

**III. Discussion.**

Iowa Rules of Civil Procedure 1.261 through 1.263 set forth the standards governing the class certification process. These rules "closely resemble Federal Rule of Civil Procedure 23," and the court "may rely on federal authorities construing similar provisions of Federal Rule of Civil Procedure 23." *Vos*, 667 N.W.2d at 44. It is the plaintiffs' obligation to define the class for which class certification is sought. *See Brownell v. State Farm Mut. Ins. Co.*, 757 F. Supp. 526, 544 (E.D. Pa. 1991) (stating the plaintiffs' burden is "adequately and accurately to define an appropriate class"); *see also Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 685 (D. Colo. 1997) (rejecting overbroad definition, stating "it is not for me to revise the proposed class definition for plaintiffs"). It is also the plaintiffs' burden to prove certification of the putative class is both permissible and proper. *Stone v. Pirelli Armstrong Tire Corp.*, 497 N.W.2d 843, 846 (Iowa 1993).

Class certification is permissible only where: (1) "The class is so numerous or so constituted that joinder of all members, whether or not otherwise required or permitted, is impracticable" and (2) "There is a question of law or fact common to the class." Iowa R. Civ. P. 1.261. Class certification is proper only if: (1) the requirements of rule 1.261 have been satisfied, (2) a class action should be permitted for the fair and efficient adjudication of the controversy, and (3) the representative parties will fairly and adequately protect the interests of the class. *See* Iowa R. Civ. P. 1.262(2).

Rule 1.263(1) lists thirteen non-exclusive factors for the court to consider "[i]n determining whether the class action should be permitted for the fair and

efficient adjudication of the controversy." Iowa R. Civ. P. 1.263(1)(a)–(m).[9] The

court "need not assign weight to any of the factors listed" and "need not make

written findings as to each factor." *Luttenegger v. Conseco Fin. Servicing Corp.*,

671 N.W.2d 425, 437 (Iowa 2003). "Rather, the district court need only weigh

---

[9] Iowa Rule of Civil Procedure 1.263(1) provides:

> In determining whether the class action should be permitted for the fair and efficient adjudication of the controversy, as appropriately limited under rule 1.262(3), the court shall consider and give appropriate weight to the following and other relevant factors:
>
> a. Whether a joint or common interest exists among members of the class.
>
> b. Whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for a party opposing the class.
>
> c. Whether adjudications with respect to individual members of the class as a practical matter would be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.
>
> d. Whether a party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.
>
> e. Whether common questions of law or fact predominate over any questions affecting only individual members.
>
> f. Whether other means of adjudicating the claims and defenses are impracticable or inefficient.
>
> g. Whether a class action offers the most appropriate means of adjudicating the claims and defenses.
>
> h. Whether members who are not representative parties have a substantial interest in individually controlling the prosecution or defense of separate actions.
>
> i. Whether the class action involves a claim that is or has been the subject of a class action, a government action, or other proceeding.
>
> j. Whether it is desirable to bring the class action in another forum.
>
> k. Whether management of the class action poses unusual difficulties.
>
> l. Whether any conflict of laws issues involved pose unusual difficulties.
>
> m. Whether the claims of individual class members are insufficient in the amounts or interests involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the class.

and consider the factors and come to a reasoned conclusion as to whether a class action should be permitted for a fair adjudication of the controversy." *Id.* Rule 1.263(2) identifies three required findings the court must make "[i]n determining . . . that the representative parties fairly and adequately will protect the interests of the class." Iowa R. Civ. P. 1.263(2)(a)–(c).[10]

In Iowa, while the courts have addressed settlement in a class action, *see, e.g.*, *Iowa Trust*, 587 N.W.2d at 221–24, and have approved a non-opt-out class certification, *see Kragnes v. City of Des Moines*, 810 N.W.2d 492, 505 (Iowa 2012), no case law has addressed or approved the use of "limited fund," non-opt-out class action settlement. The proponents of the settlement agreement here contend it was properly employed under the civil procedure rules governing class actions and principles enunciated in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). The intervenors/objectors argue the district court abused its discretion in numerous respects in approving the class certification and settlement here. We presume our supreme court would adhere to the principles enunciated in *Ortiz* before allowing a non-opt-out, limited-fund class action settlement. *See Luttenegger*, 671 N.W.2d at 436.

As one court has aptly described *Ortiz*:

---

[10] Rule 1.263(2) provides:

> (2) In determining under rule 1.262(2) that the representative parties fairly and adequately will protect the interests of the class, the court must find all of the following:
>
> a. The attorney for the representative parties will adequately represent the interests of the class.
>
> b. The representative parties do not have a conflict of interest in the maintenance of the class action.
>
> c. The representative parties have or can acquire adequate financial resources, considering rule 1.276, to ensure that the interests of the class will not be harmed.

*Ortiz* involved a large class of asbestos claimants suing a manufacturer, Fibreboard, which had in turn sued its two insurance carriers for funds to pay the claimants. *See* [*Ortiz*, 527 U.S.] at 821–23. Eleventh hour negotiations between class counsel, Fibreboard and the two insurance companies produced a settlement fund of $1.525 billion, funded nearly entirely by the insurance companies and contingent on certification under Rule 23(b)(1)(B) as a mandatory limited fund class. *See id.* at 823–25. The district court certified the class under [Federal] Rule [of Civil Procedure] 23(b)(1)(B), reasoning that, without certification and settlement, the class ran the risk that the insurance companies would prevail against Fibreboard in their pending coverage cases, leaving a much smaller fund available to the class. *See id.* at 827–28. . . .

. . . The Court expressed "serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale," *Ortiz*, 527 U.S. at 845:

First, the certification of a mandatory class followed by settlement of its action for money damages obviously implicates the Seventh Amendment jury trial rights of absent class members.

. . . .

Second, and no less important, mandatory class actions aggregating damages claims implicate the due process "principle of general application in Anglo–American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process," it being "our 'deep-rooted historic tradition that everyone should have his own day in court.'"

*Id.* at 845–46 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *Martin v. Wilks*, 490 U.S. 755, 762 (1989)) (citations omitted).

In light of these concerns, the Court counseled against "adventurous application of Rule 23(b)(1)(B)," *id.* at 845, stressing that a limited construction of the Rule, "stay[ing] close to the historical model . . . avoids serious constitutional concerns raised by the mandatory class resolution of individual legal claims . . . ." *Id.* at 842; *see also* 5 Newberg § 17:15 at 339. The Court described this "historical model" of a limited fund as "a 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Ortiz*, 527 U.S. at 841. From its discussion of the historical model, the Court identified three "presumptively necessary" characteristics of a traditional limited fund. *Id.* at 842. Those characteristics are:

(1) "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims," *id.* at 838;

(2) "the whole of the inadequate fund [is] to be devoted to the overwhelming claims," *id.* at 839; and

(3) "the claimants identified by a common theory of recovery [are] treated equitably among themselves," *id.*

*In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 192-93 (5th Cir. 2010).

The Supreme Court has stated that in an action to certify a mandatory class under a Federal Rule 23(b)(1)(B) limited-fund theory, "the settling parties must present not only their agreement, but evidence on which the district court *may ascertain the limit* and the insufficiency of the fund." *Ortiz*, 527 U.S. at 849 (emphasis added).

The district court found:

The fund in this case consists of three contributions, two from insurance carriers and one from the defendants themselves. Scottsdale Insurance Company is contributing $2,000,000 and Torus Specialty Insurance Company is contributing $75,000.00. While the record is minimal, the court is of the opinion that it establishes that the contributions from the insurance carriers are at a maximum that can be achieved within a reasonable amount of time in light of the risks associated with litigation of the insurance coverage issues. Torus has far less exposure to any of the claims asserted in this litigation by virtue of its later arrival on the scene as defendants' insurer. The policy period for Torus commenced January 23, 2012, some nine days after these suits were filed. It is providing coverage for claims "first made against such Insured during the Policy Period." It excludes any coverage for DBSI products. Without purporting to decide the issue, Torus appears to have a substantial argument that it has no coverage on these suits at all.

Scottsdale probably has coverage for at least some of the claims but the amount of that coverage is subject to significant litigation risk. Like Torus, Scottsdale's policy specifically excludes DBSI products. Scottsdale has aggressively reserved its right to litigate every exclusion contained in its policy. In addition, its policy contains the following language defining "wrongful act": "Any such 'wrongful act,' together with any related 'wrongful acts' or series of

continuous, repeated or 'interrelated wrongful acts,' shall be considered one 'wrongful act' for purposes of the application of our Limits of Liability and the applicable 'retention'." Should a court determine that the failures of due diligence amounted to a series of interrelated acts, the single limit of $1,000,000 might well be all that is available. Similar language was one of the reasons that the *Stott*[11] court relied on in approving a limited fund settlement. Settlement in this amount without the costs and delays of coverage litigation appear to be in the best interests of the class. This amount was arrived at following extensive mediation efforts which involved the plaintiffs as well as the defendants and therefore included people at the table with a definite interest in maximizing the amount to be contributed by the carrier. The court is satisfied that the insurance carrier contributions are effectively at their maximum.

The settlement is also funded by a $925,000 contribution from the defendants. In addition, the defendants are paying $130,000 towards the costs of this litigation. Whether or not this is the most that can be obtained from these defendants was probably the most serious dispute between the parties during the hearing. The court received testimony from Cyril Mandelbaum, a certified forensic accountant in private practice, and Marc A. Lefebvre, a certified financial analyst and instructor in finance at Creighton University. Both are highly qualified. Ms. Mandelbaum engaged in a detailed analysis of the defendants' financial condition and history over the past five plus years. She attempted to place a value on the various entities and assets, assuming an orderly liquidation within three to six months. Mr. Lefebvre was critical of Ms. Mandelbaum's approach, however, preferring that the operating companies be valued on a going concern basis. Since he did not attempt to analyze or value the businesses or assets, however, there is no way to tell what, if any, difference such an approach would make on valuations. In addition, these defendants have been the subject of substantial negative publicity both before and after these suits were filed. Clients and employees have left in droves. Whether or to what extent there is any going concern value appears questionable. In addition, the broker dealer, DFN Partners, LLC, has closed its doors and has no going concern value. In addition, any settlement at this point depends on what is available now, not what might be available from operations over the indefinite future. The court concludes that Ms. Mandelbaum's approach is reasonable under the circumstances.

Ms. Mandelbaum values the assets and entities at $1,923,252.77. However, this number is probably optimistic, as she notes. One sentence in her report probably sums it up best:

---

[11] *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 329–30 (N.D. Tex. 2011)

"Mr. DeWaay is presently in survival mode." The real estate which he owns may or may not sell and may or may not be worth what it is valued at. In particular, Mr. DeWaay disputes the value placed on the vacation home at Lake Okoboji. Significant real estate assets have already been surrendered to secured lenders because sales efforts were unsuccessful. The court notes the likelihood that the jewelry and collectibles will be claimed as owned by Mrs. DeWaay if a bankruptcy is filed or liquidation is forced, rendering them unavailable or at best available only after costs and delays of litigation. The likelihood of recovery for the members of this class is enhanced by the settlement, eliminating as it does the risks of insurance coverage litigation and the uncertainties and costs inherent in bankruptcy or forced liquidation. The court concludes that this is indeed a limited fund case under the factors set out in *Ortiz*.

(Footnotes omitted.)

Relying on the "presumptively necessary" characteristics delineated in *Ortiz*, we conclude the district court here abused its discretion in determining the settlement proposed involves a limited fund "set definitely at [its] maximum[]." *See* 527 U.S. at 838.

> As emphasized in *Ortiz*, the limited fund concept in subsection (b)(1)(B) contemplates a *fixed fund in the traditional sense*: a fixed resource, such as a mineral deposit, or a fixed amount of money, such as a trust.[12] The traditional and most common use of subsection (b)(1)(B) class actions is in "limited fund" cases where claims are aggregated against a *res* or preexisting fund insufficient to satisfy all claims.

*Telectronics Pacing*, 221 F.3d at 877 (emphasis added); *see In re Simon II Litig.*, 407 F.3d 125, 127-28 (2d Cir. 2005) ("We hold that the order certifying this punitive damages class must be vacated because there is no evidence by which

---

[12]This footnote *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 877 n.5 (6th Cir. 2000), provides:

> A limited fund exists when a fixed asset or piece of property exists in which all class members have a preexisting interest. . . . Classic illustrations include claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, . . . and others. 1 Newberg on Class Actions § 4.09, at 4–33 (cited in *In re Asbestos Litig.*, 134 F.3d [668,] 673 [5th Cir. (1998)] (Smith, J., dissenting)).

the district court could ascertain the limits of either the fund or the aggregate value of punitive claims against it, such that the postulated fund could be deemed inadequate to pay all legitimate claims, and thus plaintiffs have failed to satisfy one of the presumptively necessary conditions for limited fund treatment under *Ortiz*[.]"); *see also In re Park Cent. Global Litig.*, No. 3:09-CV-765-M, 2014 WL 4261950, at *7 (N.D. Tex. Aug. 25, 2014) ("In *Ortiz*, the Supreme Court specified that limited funds were only those that were pre-existing, such as trust assets or a bank account, not the personal assets of defendants. Defendants' assets are not a limited fund within one of the historical models to which the Supreme Court has specifically limited Rule 23(b)(1)(B)'s application. Were the Court to accept plaintiff's argument, conceivably any case where a defendant's assets are not sufficient to satisfy a judgment against the defendant would be a limited fund, and on that basis, a case could be certified as a class action." (citation omitted)); *Macedonia Church v. Lancaster Hotel Ltd. P'ship*, 270 F.R.D. 107, 119-20 (D. Conn. 2010) (rejecting class certification because "*Ortiz* requires that evidence be submitted so the court can determine the limit of the potential payout" and the "evidence in the record at present is insufficient to support [such] a finding"); *Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 282 (N.D. Ohio 2006) ("The Supreme Court and Sixth Circuit have recently explained that Rule 23(b)(1)(B) is limited to traditional 'limited fund' cases in which there is a 'fixed fund in the traditional sense: a fixed resource, such as a mineral deposit, or a fixed amount of money, such as a trust.'" (citing *Telectronics Pacing*, 221 F.3d at 877, and *Ortiz*, 527 U.S. at 841-42).

As recognized by the district court, the "real issue" is "the amount available to pay claims." The fund must be "set definitely at [its] maximum." *Ortiz*, 527 U.S. at 838.

In *Ortiz*, the Court wrote,

> The "fund" in this case comprised both the general assets of Fibreboard and the insurance assets provided by the two policies, see 90 F.3d, at 982 (describing the fund as Fibreboard's entire equity and $2 billion in insurance assets under the Trilateral Settlement Agreement). As to Fibreboard's assets exclusive of the contested insurance, the District Court and the Fifth Circuit concluded that Fibreboard had a then-current sale value of $235 million that could be devoted to the limited fund. While that estimate may have been conservative, at least the District Court heard evidence and made an independent finding at some point in the proceedings. The same, however, cannot be said for the value of the disputed insurance.

*Id.* at 850-51. With respect to the insurance proceeds, the Court observed the lower court had "simply accepted" the settlement figure. *Id.* at 851. "One may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arms-length bargaining, unhindered by any considerations tugging against the interests of the parties ostensibly represented in the negotiation." *Id.* at 852. The Supreme Court emphasized that it would be "essential that the fund be shown to be limited independently of the agreement of the parties to the action." *Id.* at 864. The evidence presented by the settling parties establishes no such ascertainable amount here.

The district court cited the *Stott* case as an example of a valid non-opt-out, limited-fund settlement. We, too, believe that case shows why the instant case is inappropriately designated a limited fund. In *Stott*, the court considered whether

the proposed settlement fund of $1,520,000, was "set definitely at its maximum" as required by *Ortiz.* 277 F.R.D. at 329. The limited-fund settlement "consist[ed] of $1,400,000 *remaining* in insurance coverage and a $120,000 contribution directly from Capital Financial, *which is the absolute maximum amount that FINRA has determined Capital Financial can contribute while maintaining the amount of assets necessary to maintain operations.*" *Id.* (emphasis added). The *Stott* court held, "The parties have submitted clear evidence as to the two sources of the fund: *the remaining insurance benefits*, which have been preserved through the Court's temporarily enjoining arbitration claims against Capital Financial, or $1.4 million, and the $120,000 approved for inclusion in the settlement fund by FINRA." *Id.* (emphasis added).

In *Ortiz*, the court concluded a mandatory class action was not appropriate because "[i]n this case, the limit of the fund was determined by treating the settlement agreement as dispositive." 527 U.S. at 864. With respect to the insurance proceeds here the district court wrote, "While the record is minimal, the court is of the opinion that it establishes that the contributions from the insurance carriers are at a maximum that can be achieved within a reasonable amount of time in light of the risks associated with litigation of the insurance coverage issues." But that determination is—in essence—treating the settlement agreement as dispositive. Although the proposed monies contributed by the insurance companies may well be a very good negotiated settlement, it is a settlement based upon the insurance companies' perceived risk rather than a true limited fund.

Moreover, the amount to be contributed by the defendants is not set definitely at its maximum. The expert who testified, and upon whose valuation the court relied, was charged with determining "how much liquid assets were available or assets that could be turned into liquidity in a three to six month period."[13] Ms. Mandelbaum testified she valued the assets of the defendants at $1.923 million—not the $925,000 the defendants agreed to contribute.[14] Intervenors' expert testified Ms. Mandelbaum's $1.923 million valuation was conservative. Ms. Mandelbaum acknowledged her method "probably" yielded a valuation "on the lower end." Yet the district court found the valuation optimistic and accepted the amount proposed by the parties' settlement agreement.

We understand the district court was faced with some very difficult and novel issues, and we do not fault it for attempting to use this novel certification method. Because of the circumstances presented, however, we conclude the district court abused its discretion in finally approving certification of this class action for settlement purposes because there is no definitely ascertained limited fund.

Because the court's rulings to consolidate, certify class, and approve settlement were granted for purposes of the proposed non-opt-out, limited-fund

---

[13] We note that the record does not establish that a liquidation of the defendants' assets was required.

[14] Ms. Mandelbaum testified that with respect to Don DeWaay's "many investments," which included ninety-four limited partnerships, "I took his valuation on those." The motivation of the defendant to estimate his own investments at a "maximum" value seems unlikely.

We note too that the intervenors elicited testimony at the hearing that DeWaay recently had engaged in another settlement, which contradicts the court's conclusion that the agreed to amount of contribution was the "maximum" available for the settlement class.

settlement, we make no determination whether class certification might otherwise be granted. We conclude only that the record does not support class certification for purposes of the proposed non-opt-out, limited-fund settlement.

In light of our ruling that a limited-fund class certification is not proper, we find the limitations on discovery were relative to the non-opt-out, limited-fund certification and settlement and will be at the discretion and perhaps reconsideration of the district court on remand. In regard to the consolidation of the two cases, we find no abuse of discretion but again the district court may reconsider this issue upon remand if subsequently found to be inappropriate. In respect to venue, we agree there is no authority granted under Iowa Rule of Civil Procedure 1.808 or Iowa Code chapter 616 for an intervenor to challenge venue. Accordingly, we deny the relief requested by the intervenors with respect to discovery, consolidation, and venue.

Costs on appeal shall be divided equally between the parties.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**